FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2010 NOV 22  PM 4: 11

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| ROGER B. ORENSTEEN, derivatively on behalf of ITT EDUCATIONAL SERVICES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> KEVIN M. MODANY, JOHN F. COZZI, JOHN E. DEAN, JAMES D. FOWLER, JR., JOANNA T. LAU, SAMUEL L. ODLE, LLOYD G. WATERHOUSE, VIN WEBER, JOHN A. YENA, DANIEL M. FITZPATRICK, CLARK D. ELWOOD, EUGENE W. FEICHTNER, MARTIN VAN BUREN, JEFFREY R. COOPER, NINA F. ESBIN, and DOES 1- 25 inclusive, <br><br> Defendants, <br><br> vs. <br><br> ITT EDUCATIONAL SERVICES, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> **JURY TRIAL DEMANDED** <br><br><br> **1 : 10 -cv- 1 5 1 0 WTL -DML** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### I.     OVERVIEW OF THE ACTION

1.     The federal government manages and administers billions of dollars in student financial assistance programs to students at both non-profit and for-profit educational institutions. When students default on the federal student loans, the federal government and the taxpayers are responsible for the bill.   While students at for-profit institutions represent only 9% of all college students, they receive roughly 25% of all Federal Pell Grants and Loans, and are responsible for 44% of all student loan defaults.  Based on the disproportionate percentage of student loan defaults associated with for-profit educational institutions, the federal government instructed the United States General Accounting Office ("GAO") to investigate for-profit colleges.

2.      ITT Educational Services, Inc. ("ITT Educational" or the "Company") provides various for-profit educational programs and services at the undergraduate and graduate levels. The Company owns and operates more than 120 ITT Technical Institutes and Daniel Webster College and serves approximately 80,000 students in 38 states.

3.      Beginning in 2008, the Individual Defendants (as defined in ¶30) caused ITT Educational to misrepresent that its student enrollment, revenues, and profits were all growing. But the positive statements were materially false and misleading when made because the Individual Defendants failed to disclose that the Company's purported growth and profits were achieved through an improper course of conduct, including misleading students into enrolling in ITT Educational's educational programs through improper and manipulative recruiting tactics.

4.      Despite knowledge about ITT Educational's illicit recruiting methods, the Board of Directors (the "Board") authorized the Company to repurchase up to 10 million shares of its common stock on the open market. While the Individual Defendants were issuing false and misleading statements, the Individual Defendants caused the Company to repurchase over *$750 million* of its own shares at artificially inflated prices. At the same time, the Individual Defendants sold over $8.9 million of their privately held ITT Educational shares at artificially inflated prices.

5.      On August 3, 2010, the GAO issued a report concluding that for-profit educational institutions, like ITT Educational, had engaged in an illegal and fraudulent course of action designed to recruit students and over-charge the federal government for the cost of such education. When this news surfaced, the Company's stock fell 29% from $90.32 on July 20, 2010 to $64.33 on August 13, 2010.

6.      On August 6, 2010, ITT Educational announced that it had received a request for information and documents from the U.S. Senate Committee on Health, Education, Labor and Pensions (the "Committee") related to the Committee's review of for-profit colleges receiving Title IV student financial aid. Specifically, the request sought information and documents to more accurately understand how the Company uses federal resources, *including how it recruits and enrolls students*, sets program price or tuition, determines financial aid including private or

institutional loans, tracks attendance, handles withdrawal of students and return of Title IV dollars, and manages compliance with the requirement that no more than 90% of revenues come from Title IV dollars. The request also sought a complete understanding of the number of students who complete or graduate from programs offered by the Company, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how the Company tracks and manages the number of students who risk default within the cohort default rate window. This investigation is ongoing.

7.     Plaintiff Roger B. Orensteen ("Plaintiff"), a shareholder of ITT Educational, on behalf of the Company, and by its counsel, submits this Verified Shareholder Derivative Complaint (the "Complaint") against certain officers and directors of ITT Educational concerning wrongdoing that occurred between 2008 and the present. On behalf of ITT Educational, Plaintiff asserts claims for violations of federal securities laws, state law claims for breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, and insider trading against ITT Educational's officers and directors. Plaintiff seeks to recover substantial losses to ITT Educational and other damages, such as to its reputation and goodwill.

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Securities Exchange Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.     Venue is proper in this District because ITT Educational has its corporate headquarters in Carmel, Indiana.

## III.    THE PARTIES

### A.    Plaintiff

10.    Plaintiff is a current shareholder of ITT Educational, was a shareholder of ITT Educational at the time of the transactions and events complained of herein, and has continuously held the stock.

### B.    Nominal Defendant

11.    Nominal Defendant ITT Educational is a Delaware corporation with its corporate headquarters in Carmel, Indiana.  As of March 5, 2010, ITT Educational had approximately 34,523,970 outstanding shares.  ITT Educational is traded on the NYSE under the ticker symbol "ESI."

### C.    Individual Defendants

12.    Defendant Kevin M. Modany ("Modany") has served as the Chairman of the Board since February 1, 2008 and as the Chief Executive Officer since April 1, 2007.  He has also served as the Company's President since April 2005.  From April 2005 until his promotion to Chief Executive Officer, Modany also served as Chief Operating Officer.  From January 2003 through May 2005, he served as Chief Financial Officer.  From July 2002 through April 2005, he served as a Senior Vice President.  Modany has been a director since July 2006.  ITT Educational paid Modany the following compensation:

| Year | Salary | Option Awards | Incentive Plan Compensation | Bonus | Other | Total |
|------|--------|---------------|-----------------------------|-------|-------|-------|
| 14. 2009 | $712,500 | $5,405,000 | $1,450,000 | --- | $50,395 | $7,629,170 |
| 15. 2008 | $663,750 | $2,779,771 | $843,750 | $337,500 | $49,574 | $4,677,377 |

16.    Defendant John F. Cozzi ("Cozzi") has served as a director of the Company since October 2003.  He is also a member of the Audit Committee.

17.    Defendant John E. Dean ("Dean") has served as a director of the Company since December 1994.  He is also the Chair of the Audit Committee.  While the Individual Defendants

were issuing false and misleading statements, Dean sold 13,077 shares of his ITT Educational stock for proceeds of $1,392,831.

18.     Defendant James D. Fowler, Jr. ("Fowler") has served as a director of the Company since April 1994.

19.     Defendant Joanna T. Lau ("Lau") has served as a director of the Company since October 2003.  She is also a member of the Audit Committee.

20.     Defendant Samuel L. Odle ("Odle") has served as a director of the Company since June 2006.

21.     Defendant Lloyd G. Waterhouse ("Waterhouse") is a director of the Company.  He is also a member of the Audit Committee.

22.     Defendant Vin Weber ("Weber") has served as a director of the Company since December 1994.  While the Individual Defendants were issuing false and misleading statements, Weber sold 12,500 shares of his ITT Educational stock for proceeds of $1,398,870.

23.     Defendant John A. Yena ("Yena") has served as a director of the Company since May 2006.

24.     Defendant Daniel M. Fitzpatrick ("Fitzpatrick") has served as the Executive Vice President and Chief Financial Officer since April 2009.  From June 2005 through March 2009, he served as Senior Vice President and Chief Financial Officer.  ITT Educational paid Fitzpatrick the following compensation:

| Year | Salary | Option Awards | Incentive Plan Compensation | Bonus | Other | Total |
|------|--------|---------------|-----------------------------|-------|-------|-------|
| 2009 | $300,000 | $1,081,000 | $396,500 | --- | $17,117 | $1,794,617 |
| 2008 | $279,575 | $581,395 | $213,750 | $85,500 | $16,094 | $1,176,314 |

27.     Defendant Clark D. Elwood ("Elwood") is the Executive Vice President, Chief Administrative and Legal Officer for the Company.  He has served as an Executive Vice President and Chief Administrative Officer since April 2009.  From December 1996 through March 2009, he

served as a Senior Vice President, as Secretary since October 2002, and as General Counsel since May 1991. While the Individual Defendants were issuing false and misleading statements, Elwood sold 22,061 shares of his ITT Educational stock for proceeds of $2,444,359. ITT Educational paid Elwood the following compensation:

| Year | Salary | Option Awards | Incentive Plan Compensation | Bonus | Other | Total |
|------|--------|---------------|------------------------------|-------|-------|-------|
| 2009 | $295,000 | $1,081,000 | $390,000 | --- | $49,298 | $1,828,590 |
| 2008 | $275,025 | $581,395 | $192,000 | $77,000 | $15,378 | $1,154,228 |

31.    Eugene W. Feichtner ("Feichtner") has served as an Executive Vice President and President since April 2009. Form March 2004 through March 2009, he served as Senior Vice President, Operations. From March 2002 through February 2004, he served as Vice President, National Operations Director. While the Individual Defendants were issuing false and misleading statements, Feichtner sold 9,000 shares of his ITT Educational stock for proceeds of $758,550. ITT Educational paid Feichtner the following compensation:

| Year | Salary | Option Awards | Incentive Plan Compensation | Bonus | Other | Total |
|------|--------|---------------|------------------------------|-------|-------|-------|
| 2009 | $267,500 | $945,875 | $330,000 | --- | $8,224 | $1,601,380 |
| 2008 | $241,250 | $581,395 | $168,438 | $67,375 | $11,835 | $1,090,798 |

36.    Defendant Jeffrey R. Cooper ("Cooper") has served as Senior Vice, Chief Compliance Officer since November 2004. While the Individual Defendants were issuing false and misleading statements, Cooper sold 15,000 shares of his ITT Educational stock for proceeds of $1,869,675.

37.    Defendant Nina F. Esbin ("Esbin") has served as Senior Vice President, Human Resources since January 2004. From January 2003 through December 2003, she served as Vice President, Director Human Resources. While the Individual Defendants were issuing false and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misleading statements, Esbin sold 5,000 shares of her ITT Educational stock for proceeds of $632,050.

38.     Defendant Martin Van Buren ("Van Buren") has served as Executive Vice President and Chief Information Officer since April 2009. From April 2008 through March 2009, he served as Senior Vice President, Chief Information Officer. From January 2004 to March 2008, he was Vice President, Information Technology. While the Individual Defendants were issuing false and misleading statements, Van Buren sold 4,000 shares of his ITT Educational stock for proceeds of $469,399.

39.     Modany, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena are sometimes referred to herein as the "Director Defendants."

40.     Modany, Fitzpatrick, Elwood, Feichtner, Cooper, Esbin, and Van Buren are sometimes referred to herein as the "Officer Defendants."

41.     Cozzi, Dean, Lau, and Waterhouse are sometimes referred to herein as the "Audit Committee Defendants."

42.     The Director Defendants, the Officer Defendants, and the Audit Committee Defendants are sometimes referred to as the "Individual Defendants."

43.     The true names and capacities of Defendants sued herein as Does 1 through 25, inclusive, are presently not known to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek to amend this Complaint to include these Doe Defendants' true names and capacities when they are ascertained. Each of the fictitiously named Defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by ITT Educational as a result of Defendants' wanton and illegal conduct.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

44.     ITT Educational is a leading provider of technology-oriented postsecondary education in the United States based on revenue and student enrollment. The Company offers master's, bachelor's, and associate's degree programs to approximately 88,000 students at ITT Technical

Institute and Daniel Webster College locations. The Company has 130 locations (including 126 campuses and four learning sites) in 38 states. The Company has provided career-oriented education programs since 1969 under the "ITT Technical Institute" name and since June 2009 under the "Daniel Webster College" name.

45.    In the past few years, the Company has experienced unprecedented student enrollment at its universities.

**B.    The Individual Defendants Caused the Company to Issue False and Misleading Statements**

46.    On January 24, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the three and twelve months ended December 31, 2007.

47.    In the press release, the Individual Defendants represented the following:

> CARMEL, IN, January 24, 2008—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the fourth quarter of 2007 increased 13.1% to 11,542 compared to 10,208 in the same period in 2006. Total student enrollment increased 13.1% to 53,027 as of December 31, 2007 compared to 46,896 as of December 31, 2006. The quarterly persistence rate increased 110 basis points to 77.3% in the three months ended December 31, 2007 compared to 76.2% in the same prior year period.

> \*\*\*

> Modany observed, "We are very pleased with the increase in the quarterly persistence rate, which resulted from improved student retention. The improvement in student retention was primarily due to the continued implementation of our modified hybrid delivery model. The year-over-year increase of 110 basis points in the quarterly persistence rate to 77.3% in the fourth quarter of 2007 exceeded our internal goal and led to an impressive year-over-year increase of 13.1% in total student enrollment as of December 31, 2007. While we believe that we can continue to improve student persistence, we expect future increases in the quarterly persistence rate to be more moderate."

> \*\*\*

> Daniel M. Fitzpatrick, Senior Vice President and CFO of ITT/ESI, said, "Our fourth quarter and full-year 2007 results were very impressive. Our operating and financial performance in 2007 exceeded our internal goals and has

positioned us extremely well for 2008. Revenue increased 11.7% to $230.4 million in the three months ended December 31, 2007 compared to $206.2 million in the same period in 2006. Excluding laptop computer sales, revenue in the three months ended December 31, 2007 increased 14.2% compared to the same period in 2006. The increase in revenue was driven by higher student enrollment, tuition and student persistence."

48.    These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

49.    On February 21, 2008, the Company filed its annual report on a Form 10-K for the year ended December 31, 2007 with the Securities and Exchange Commission ("SEC"), which was signed by Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Morgan, Odle, Weber, and Yena. Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-K did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Cozzi, Dean, and Lau reviewed and approved the 10-K prior to the time it was issued. Indeed, they are specifically required to do so as members of the Audit Committee. The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

50.   The Form 10-K represented the following in relevant parts:

> *Year Ended December 31, 2007 Compared with Year Ended December 31,*
> *2006.* Revenue increased $111.7 million, or 14.7%, to $869.5 million in the
> year ended December 31, 2007 compared to $757.8 million in the year ended
> December 31, 2006, primarily due to:
> - an average 11.0% increase in total student enrollment in each
>   academic quarter beginning in 2007 compared to 2006;
> - a 5.0% increase in tuition rates in March 2007; and
> - an increase in our student persistence in each quarter in 2007
>   compared to the same quarter in 2006.
>
> The increase in revenue was partially offset by lower sales of laptop
> computers. The increase in student enrollment was primarily due to:
>
> - operating new institutes and learning sites; and
> - an increased number of new programs of study offered by our
>   institutes.
>
> * * *
>
> **Business Strategy**
>
> Our strategy is to pursue multiple opportunities for growth. We are
> implementing a growth strategy designed to increase revenue and operating
> efficiencies by increasing the number and types of program offerings and
> student enrollment at existing institutes, operating new institutes across the
> United States and adding learning sites to existing institutes.

51.   These statements were false and misleading because the Individual Defendants failed

to disclose that the Company overstated its growth prospects by engaging in illicit and improper

recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment

advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to

disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying

about accreditation; (iv) enticing students to take out student loans even when the applicant had

substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and

unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to

disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

52. On April 24, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the first quarter ended March 31, 2008.

53. In the press release, the Individual Defendants represented the following:

> CARMEL, IN, April 24, 2008—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that Earnings Per Share ("EPS") in the first quarter of 2008 increased 63.6% to $1.08 compared to $0.66 in the first quarter of 2007. Revenue in the three months ended March 31, 2008 increased 15.0% to $234.9 million compared to $204.2 million in the first quarter of 2007. Operating margin increased 770 basis points to 29.3% in the first quarter of 2008 compared to 21.6% in the same period in 2007.
>
> Total student enrollment increased 9.9% to a record 54,194 as of March 31, 2008 compared to 49,295 as of March 31, 2007. New student enrollment in the first quarter of 2008 increased 8.7% to 13,844 compared to 12,738 in the first quarter of 2007.
>
> ***
>
> Daniel M. Fitzpatrick, Senior Vice President and CFO of ITT/ESI, said, "Our first quarter financial results were extraordinarily strong and exceeded our internal goals. Revenue increased 15.0% to $234.9 million in the three months ended March 31, 2008 compared to $204.2 million in the same period in 2007. The increase in revenue was primarily due to increases in student enrollment and tuition rates."

54. These statements about ITT Educational's student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated;

(vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

55.     On April 24, 2008, the Company filed its quarterly report with the SEC on a Form 10-Q for the quarter ended March 31, 2008, which was signed by Defendant Fitzpatrick.  Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls.  Moreover, Defendants Cozzi, Dean, and Lau reviewed and approved the 10-Q prior to the time it was issued.  Indeed, they are specifically required to do so as members of the Audit Committee.   The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

56.     The Form 10-Q represented the following in relevant part:

> **Three Months Ended March 31, 2008 Compared with Three Months Ended March 31, 2007.**  Revenue increased $30.7 million, or 15.0%, to $234.9 million in the three months ended March 31, 2008 compared to $204.2 million in the three months ended March 31, 2007, primarily due to:
>
> - a 13.1% increase in total student enrollment at December 31, 2007 compared to December 31, 2006; and
> - a 5.0% increase in tuition rates in March 2008 and March 2007.
>
> The increase in revenue was partially offset by a 190 basis point reduction in our students' persistence to 76.1% for the three months ended March 31, 2008 compared to 78.01% for the three months ended March 31, 2007.
>
> The increase in student enrollment was primarily due to:
>
> - student enrollment growth in programs of study and at locations that were in existence prior to 2007;
> - new programs of study offered by our institutes; and
> - operating new institutes.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

57.     These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

58.     On July 24, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the second quarter ended June 30, 2008.

59.     In the press release, the Individual Defendants represented the following:

> CARMEL, IN, July 24, 2008—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the second quarter of 2008 increased 22.5% to 14,751 compared to 12,043 in the second quarter of 2007. Total student enrollment increased 12.1% to 54,793 as of June 30, 2008 compared to 48,873 as of June 30, 2007.
>
> ***
>
> Daniel M. Fitzpatrick, Senior Vice President and CFO of ITT/ESI, said, "Revenue increased 13.6% to $246.4 million in the three months ended June 30, 2008 compared to $217.0 million in the same period in 2007. The increase in revenue was primarily due to increases in student enrollment and tuition rates."

60.     These statements about ITT Educational's strong student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

61.     On July 24, 2008, the Company filed its quarterly report with the SEC on a Form 10-Q for the quarter ended June 30, 2008, which was signed by Defendant Fitzpatrick. Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Cozzi, Dean, and Lau reviewed and approved the 10-Q prior to the time it was issued. Indeed, they are specifically required to do so as members of the Audit Committee. The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

62.     The Form 10-Q represented the following in relevant part:

> **Three Months Ended June 30, 2008 Compared with Three Months Ended June 30, 2007.** Revenue increased $29.4 million, or 13.6%, to $246.4 million in the three months ended June 30, 2008 compared to $217.0 million in the three months ended June 30, 2007, primarily due to:
>
> - a 9.9% increase in total student enrollment at March 31, 2008 compared to March 31, 2007; and
> - a 5.0% increase in tuition rates in March 2008.
>
> The increase in student enrollment was primarily due to:
>
> - student enrollment growth in programs of study and at locations that were in existence prior to 2007;
> - new programs of study offered by our institutes; and
> - operating new institutes.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

63.     These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

64.     On October 23, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended September 30, 2008.

65.     In the press release, the Individual Defendants represented the following:

> CARMEL, IN, October 23, 2008—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the third quarter of 2008 increased 19.4% to 21,807 compared to 18,270 in the third quarter of 2007.  Total student enrollment increased 14.7% to a record 61,556 as of September 30, 2008 compared to 53,675 as of September 30, 2007.
>
> * * *
>
> Kevin M. Modany, Chairman, CEO and President of ITT/ESI, said, "In the midst of one of the nation's most tumultuous economic periods, our organization delivered some of the most impressive results in its history.  We could not be more proud of our management, faculty and staff for the results that they produced in the third quarter of 2008.  As we look forward over the next several quarters, we believe that the national economy will continue to face significant challenges.  In past recessionary environments, however, our student enrollment grew as more people pursued postsecondary education to learn new, or upgrade existing, skills in order to help them compete in a soft economy and a tighter job market.  We view that to be particularly relevant in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

today's employment climate where skilled labor is valued at a premium. As a result, we are optimistic about our prospects during the current economic environment, and believe that we are well positioned to help the country navigate through this very difficult time and benefit in the process."

\*\*\*

Daniel M. Fitzpatrick, Senior Vice President and CFO of ITT/ESI, said, "Revenue increased 16.7% to $254.3 million in the three months ended September 30, 2008 compared to $217.9 million in the same period in 2007. The increase in revenue was primarily due to the reported increase in total student enrollment and tuition rates."

66.     These statements about ITT Educational's strong student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

67.     On October 23, 2008, the Company filed its quarterly report with the SEC on a Form 10-Q for the quarter ended September 30, 2008, which was signed by Defendant Fitzpatrick. Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Cozzi, Dean, and Lau reviewed and approved the 10-Q prior to the time it was issued. Indeed, they are specifically required to do so as members of the Audit Committee. The Charter of the Audit Committee requires the members of the Committee

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

68.     The Form 10-Q represented the following in relevant part:

> *Three Months Ended September 30, 2008 Compared with Three Months Ended September 30, 2007.* Revenue increased $36.3 million, or 16.7%, to $254.3 million in the three months ended September 30, 2008 compared to $217.9 million in the three months ended September 30, 2007, primarily due to:
>
> - a 12.1% increase in total student enrollment at June 30, 2008 compared to June 30, 2007; and
> - a 5.0% increase in tuition rates in March 2008.
>
> The increase in student enrollment was primarily due to:
>
> - student enrollment growth in programs of study and at locations that were in existence prior to 2007;
> - new programs of study offered by our institutes; and
> - operating new institutes.

69.     These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

70.     On January 22, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the three and twelve months ended December 31, 2008.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

71.   In the press release, the Individual Defendants represented the following:

CARMEL, IN, January 22, 2009—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the fourth quarter of 2008 increased 29.2% to 14,911 students compared to 11,542 in the same period in 2007. Total student enrollment increased 16.9% to 61,983 as of December 31, 2008 compared to 53,027 as of December 31, 2007.

\*\*\*

Daniel M. Fitzpatrick, Senior Vice President and CFO of ITT/ESI, said, "The outstanding results for the fourth quarter and full year of 2008 once again exceeded our internal expectations and put us in a very good position to start the new year.  Revenue increased an impressive 21.4% to $279.8 million in the three months ended December 31, 2008 compared to $230.4 million in the same period in 2007.  This increase was due primarily to robust new student enrollment and higher student retention.  The combined increases in new student enrollment and student retention led to an impressive 16.9% year-over-year increase in total student enrollment.  Operating margin in the fourth quarter of 2008 increased 290 basis points to 36.5% compared to 33.6% in the fourth quarter of 2007, due to our ability to leverage fixed operating costs on a total student enrollment that was substantially higher as of December 31, 2008 compared to December 31, 2007."

72.   These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

73.    On February 18, 2009, the Company filed its annual report on a Form 10-K for the year ended December 31, 2008 with the SEC, which was signed by Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Weber, and Yena.  Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-K did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Cozzi, Dean, and Lau reviewed and approved the 10-K prior to the time it was issued.  Indeed, they are specifically required to do so as members of the Audit Committee.  The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

74.    The Form 10-K represented the following in relevant parts:

> *Year Ended December 31, 2008 Compared with Year Ended December 31, 2007.*  Revenue increased $145.8 million, or 16.8%, to $1,015.3 million in the year ended December 31, 2008 compared to $869.5 million in the year ended December 31, 2007, primarily due to:
>
> - an average 12.5% increase in total student enrollment in each academic quarter beginning in 2008 compared to 2007; and
> - a 5.0% increase in tuition rates in March 2008.
>
> The increase in student enrollment was primarily due to:
>
> - student enrollment growth in programs of study and at locations that were in existence prior to 2007;
> - new programs of study offered by our institutes; and
> - operating new institutes.

* * *

**Business Strategy**

Our strategy is to pursue multiple opportunities for growth.  We are implementing a growth strategy designed to increase revenue and operating efficiencies by increasing the number and types of program offerings and student enrollment at existing institutes, operating new institutes across the United States and adding learning sites to existing institutes.

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

75.     These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

76.     On April 23, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the three-month period ended March 31, 2009.

77.     In the press release, the Individual Defendants represented the following:

> CARMEL, IN, April 23, 2009—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the first quarter of 2009 increased a record 36.8% to 18,935 students compared to 13,844 in the same period in 2008. Total student enrollment increased 21.1% to 65,620 as of March 31, 2009 compared to 54,194 as of March 31, 2008.
>
> ***
>
> Daniel M. Fitzpatrick, Executive Vice President and CFO of ITT/ESI, said, "Revenue increased 22.6% to $288.0 million in the three months ended March 31, 2009 compared to $234.9 million in the same period in 2008. The increase was a result of higher new student enrollment and improved student retention, which combined led to a record-breaking 21.1% increase in total student enrollment as of March 31, 2009 compared to March 31, 2008."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

78.     These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

79.     On April 23, 2009, the Company filed its quarterly report with the SEC on a Form 10-Q for the quarter ended March 31, 2009, which was signed by Defendant Fitzpatrick.  Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls.  Moreover, Defendants Cozzi, Dean, Lau, and Waterhouse reviewed and approved the 10-Q prior to the time it was issued.  Indeed, they are specifically required to do so as members of the Audit Committee.     The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

80.     The Form 10-Q represented the following in relevant part:

*Three Months Ended March 31, 2009 Compared with Three Months Ended March 31, 2008.*   Revenue increased $53.1 million, or 22.6%, to $288.0 million in the three months ended March 31, 2009 compared to $234.9 million in the three months ended March 31, 2008, primarily due to:

  • a 16.9% increase in total student enrollment at December 31, 2008

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

compared to December 31, 2007;

- a 5.0% increase in tuition rates in March 2009 and March 2008; and
- a 21.1% increase in total student enrollment at March 31, 2009 compared to March 31, 2008.

The increase in student enrollment was primarily due to:

- student enrollment growth in programs of study and at locations that were in existence prior to 2008;
- new programs of study offered by our institutes; and
- operating new institutes.

81.     These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

82.     On July 23, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the second quarter ended June 30, 2009.

83.     In the press release, the Individual Defendants represented the following:

CARMEL, IN, July 23, 2009—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the second quarter of 2009 increased 33.5% to 19,692 compared to 14,751 in the same period in 2008. Total student enrollment increased 26.2% to 69,127 as of June 30, 2009 compared to 54,793 as of June 30, 2008.

\*\*\*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Kevin M. Modany, Chairman and CEO of ITT/ESI, said, "Interest in our programs across all six schools of study was incredibly strong during the second quarter of 2009, which led to an impressive increase in new student enrollment compared to the prior year. As we entered the third quarter of 2009, inquiries from prospective students for our high-quality, career-based programs of study remained robust, and we believe that the economic conditions that are stimulating this extraordinary demand may persist throughout the remainder of 2009."

* * *

Fitzpatrick noted, "The unexpectedly strong increase in new student enrollment and the healthy advances in student retention generated unprecedented total student enrollment as of June 30, 2009. While the strength of the increase was very good news, it caused our students' need for private education loans to far exceed the amount of those loans that was made available during the quarter under the new private education loan program offered to our students. As a result, the amount of internal student financing that we provided during the second quarter increased significantly, leading to days sales outstanding as of June 30, 2009 of 20 days compared to 10.8 days as of the same point in the prior year. Consequently, bad debt expense as a percentage of revenue in the second quarter of 2009 increased 200 basis points to 5.9% compared to 3.9% in the second quarter of 2008."

84.     These statements about ITT Educational's explosive student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

85.     On July 23, 2009, the Company filed its quarterly report with the SEC on a Form 10-Q for the quarter ended June 30, 2009, which was signed by Defendant Fitzpatrick. Defendants

23

Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Cozzi, Dean, Lau, and Waterhouse reviewed and approved the 10-Q prior to the time it was issued. Indeed, they are specifically required to do so as members of the Audit Committee.   The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

86.   The Form 10-Q represented the following in relevant part:

> ***Three Months Ended June 30, 2009 Compared with Three Months Ended June 30, 2008.***   Revenue increased $70.7 million, or 28.7%, to $317.1 million in the three months ended June 30, 2009 compared to $246.4 million in the three months ended June 30, 2008.   The primary factors that contributed to this increase included, in order of significance:
>
> - an 21.1% increase in total student enrollment at March 31, 2009 compared to March 31, 2008;
> - a 5.0% increase in tuition rates in March 2009;
> - a 140 basis point increase in the student persistence rate in the three months ended June 30, 2009 compared to the three months ended June 30, 2008.
>
> The primary factors that contributed to the increase in student enrollment included, in order of significance:
>
> - student enrollment growth in programs of study and at locations that were in existence prior to 2008;
> - new programs of study offered at our campuses; and
> - operating new campuses.

87.   These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

88.     On October 22, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended September 30, 2009.

89.     In the press release, the Individual Defendants represented the following:

> CARMEL, IN, October 22, 2009—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the third quarter of 2009 increased 27.2% to 27,738 compared to 21,807 in the same period in 2008.  Total student enrollment increased 28.7% to 79,208 as of September 30, 2009 compared to 61,556 as of September 30, 2008.

90.     These statements about ITT Educational's explosive student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

91.     On October 22, 2009, the Company filed its quarterly report with the SEC on a Form

10-Q for the quarter ended September 30, 2009, which was signed by Defendant Fitzpatrick.

Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q

did not contain any material misrepresentations and that the Company maintained appropriate and

effective internal controls. Moreover, Defendants Cozzi, Dean, Lau, and Waterhouse reviewed and

approved the 10-Q prior to the time it was issued. Indeed, they are specifically required to do so as

members of the Audit Committee. The Charter of the Audit Committee requires the members of the

Committee to review with financial management and the independent auditor the financial

information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of

earnings.

92.     The Form 10-Q represented the following in relevant parts:

> **Three Months Ended September 30, 2009 Compared with Three Months
> Ended September 30, 2008.**  Revenue increased $85.4 million, or 33.6%, to
> $339.6 million in the three months ended September 30, 2009 compared to
> $254.3 million in the three months ended September 30, 2008. The primary
> factors that contributed to this increase included, in order of significance:
>
> - an 27.6% increase in total student enrollment at June 30, 2009
>   compared to June 30, 2008;
> - a 5.0% increase in tuition rates in each of March 2009 and March
>   2008; and
> - a 140 basis point increase in the student persistence rate as of June
>   30, 2009 compared to June 30, 2008.
>
> The primary factors that contributed to the increase in student enrollment
> included, in order of significance:
>
> - student enrollment growth in programs of study and at locations that
>   were in operation prior to 2008;
> - new programs of study offered at our campuses; and
> - operating new campuses.

93.     These statements were false and misleading because the Individual Defendants failed

to disclose that the Company overstated its growth prospects by engaging in illicit and improper

recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

94.     On January 21, 2010, the Individual Defendants caused the Company to issue a press release announcing its financial results for the full year and fourth quarter ended December 31, 2009.

95.     In the press release, the Individual Defendants represented the following:

> CARMEL, IN, January 21, 2010—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the fourth quarter of 2009 increased 31.2% to 19,563 compared to 14,911 in the same period in 2008. Total student enrollment increased 30.3% to 80,766 as of December 31, 2009 compared to 61,983 as of December 31, 2008.

96.     These statements about ITT Educational's explosive student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

97. On February 19, 2010, the Company filed its annual report on a Form 10-K for the year ended December 31, 2009 with the SEC, which was signed by Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena. Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-K did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Cozzi, Dean, Lau, and Waterhouse reviewed and approved the 10-K prior to the time it was issued. Indeed, they are specifically required to do so as members of the Audit Committee. The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

98. The Form 10-K represented the following in relevant parts:

> *Year Ended December 31, 2009 Compared with Year Ended December 31, 2008.* Revenue increased $303.9 million, or 29.9%, to $1,319.2 million in the year ended December 31, 2009 compared to $1,015.3 million in the year ended December 31, 2008. The primary factors that contributed to this increase included, in order of significance:
>
> - an average 27.1% increase in total student enrollment in each academic quarter beginning in 2009 compared to 2008;
> - a 5.0% increase in tuition rates in each of March 2009 and March 2008; and
> - a 16.9% increase in total student enrollment at December 31, 2008 compared to December 31, 2007.
>
> The primary factors that contributed to the increase in student enrollment included, in order of significance:
>
> - student enrollment growth in programs of study and at locations that were in operation prior to 2008;
> - new programs of study offered at our campuses; and
> - operating new campuses.

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Business Strategy**

Our strategy is to pursue multiple opportunities for growth.  We are
implementing a growth strategy designed to increase revenue and operating
efficiencies by:

- increasing the number and types of program offerings that are
  delivered in residence and/or online;
- increasing student enrollment at existing campuses;
- operating new campuses across the United States; and
- adding learning sites to existing campuses.

\* \* \*

In February 2009, we entered into an agreement with an unaffiliated third
party whereby private education loans are provided to our students to help the
students pay the portion of the cost of their education that is not covered by
student financial aid from federal, state and other sources (the "Private
Student Loan Program").  The Private Student Loan Program covers the three
year period of 2009, 2010 and 2011.  In connection with the Private Student
Loan Program, we entered into a risk sharing agreement (the "2009 RSA")
under which we have guaranteed the repayment of any private education
loans that are charged off above a certain percentage of the private education
loans made under the Private Student Loan Program, based on the annual
dollar volume. As of December 31, 2009, approximately $56 million of
private education loans had been made under the Private Student Loan
Program.  Our obligations under the 2009 RSA will remain in effect until all
private education loans made under the Private Student Loan Program are
paid in full or charged off. The standard repayment term for a private
education loan made under the Private Student Loan Program is ten years,
with repayment generally beginning six months after a student graduates or
three months after a student withdraws or is terminated from his or her
program of study.  We did not record a liability for our guarantee obligations
under the 2009 RSA as of December 31, 2009, because we do not anticipate
that the amount of private education loans charged off will exceed the
percentage that would require us to make a payment under our guarantee.

99.    These statements were false and misleading because the Individual Defendants failed

to disclose that the Company overstated its growth prospects by engaging in illicit and improper

recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment

advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to

disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

100.    On April 22, 2010, the Individual Defendants caused the Company to issue a press release announcing its financial results for the three months ended March 31, 2010.

101.    In the press release, the Individual Defendants represented the following:

> CARMEL, IN, April 22, 2010—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the first quarter of 2010 increased 21.8% to 23,064 compared to 18,935 in the same period in 2009.  Total student enrollment increased 28.9% to 84,555 as of March 31, 2010 compared to 65,620 as of March 31, 2009.

102.    These statements about ITT Educational's explosive student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

103.    On April 22, 2010, the Company filed its quarterly report with the SEC on a Form 10-Q for the quarter ended March 31, 2010, which was signed by Defendant Fitzpatrick. Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Cozzi, Dean, Lau, and Waterhouse reviewed and approved the 10-Q prior to the time it was issued. Indeed, they are specifically required to do so as members of the Audit Committee.  The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

104.    The Form 10-Q represented the following in relevant parts:

> ***Three Months Ended March 31, 2010 Compared with Three Months Ended March 31, 2009.*** Revenue increased $95.9 million, or 33.3%, to $384.0 million in the three months ended March 31, 2010 compared to $288.0 million in the three months ended March 31, 2009.  The primary factors that contributed to this increase included, in order of significance:
>
> - a 30.3% increase in total student enrollment at December 31, 2009 compared to December 31, 2008; and
> - a 5.0% increase in tuition rates implemented in March 2010 and March 2009; and
> - a 28.9% increase in total student enrollment at March 31, 2010 compared to March 31, 2009.
>
> The primary factors that contributed to the increase in student enrollment included, in order of significance:
>
> - student enrollment growth in programs of study and at locations that were in operation prior to 2008;
> - new programs of study offered at our campuses; and
> - operating new campuses.

105.    These statements were false and misleading because the Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors

for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. Additionally, this statement was false and misleading because it failed to disclose that the Company did not maintain effective and appropriate internal controls.

106.    On July 22, 2010, the Individual Defendants caused the Company to issue a press release announcing its financial results for the three months ended June 30, 2010.

107.    In the press release, the Individual Defendants represented the following:

> CARMEL, IN, July 22, 2010—ITT Educational Services, Inc. (NYSE: ESI), a leading provider of technology-oriented postsecondary degree programs, today reported that new student enrollment in the second quarter of 2010 increased 10.1% to 21,673 compared to 19,692 in the same period in 2009. Total student enrollment increased 21.2% to 84,695 as of June 30, 2010 compared to 69,889 as of June 30, 2009.

108.    These statements about ITT Educational's explosive student enrollment growth were false and misleading because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

109.    On July 23, 2010, the Company filed its quarterly report with the SEC on a Form 10-Q for the second quarter ended June 30, 2010, which was signed by Defendant Fitzpatrick. Defendants Modany and Fitzpatrick also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls.  Moreover, Defendants Cozzi, Dean, Lau, and Waterhouse reviewed and approved the 10-Q prior to the time it was issued.  Indeed, they are specifically required to do so as members of the Audit Committee. The Charter of the Audit Committee requires the members of the Committee to review with financial management and the independent auditor the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

110.    The Form 10-Q represented the following in relevant parts:

> *Three Months Ended June 30, 2010 Compared with Three Months Ended June 30, 2009.*  Revenue increased $84.7 million, or 26.7%, to $401.8 million in the three months ended June 30, 2010 compared to $317.1 million in the three months ended June 30, 2009.  The primary factors that contributed to this increase included, in order of significance:
>
> - a 28.9% increase in total student enrollment at March 31, 2010 compared to March 31, 2009; and
> - a 5.0% increase in tuition rates implemented in March 2010.
>
> The primary factors that contributed to the increase in student enrollment included, in order of significance:
>
> - student enrollment growth in programs of study and at locations that were in operation prior to 2009;
> - new programs of study offered at our campuses; and
> - operating new campuses.

111.    These statements were false and misleading because the Individual Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) offering prohibited incentive payments to the Company's enrollment advisors for securing student enrollment; (ii) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (iii) lying

about accreditation; (iv) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (v) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (vi) failing to disclose graduation rates; and (vii) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

## V.    THE TRUTH EMERGES

### A.    The GAO Report

112.    On August 3, 2010, the news media circulated an undercover investigative report conducted by the GAO entitled, "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices." The report concluded that (1) certain for-profit schools used deceptive recruiting practices; (2) certain for-profit schools "encouraged fraudulent practices" to their students such as falsifying their financial aid forms to qualify for federal aid; (3) certain for-profit schools substantially inflated their tuition costs; and (3) certain for-profit schools engaged in other "troubling" practices. The *Wall Street Journal* reported that the GAO accused several colleges of encouraging fraud and engaging in deceptive and questionable marketing practices. By using undercover tests at 15 for-profit colleges, the GAO "found that four privately held schools encouraged fraudulent practices and all 15 made deceptive or otherwise questionable statements to the GAO's undercover applicants." Further, the *Wall Street Journal* reported the following:

> The GAO report said that four undercover applicants were encouraged by college personnel to falsify their financial-aid forms to qualify for federal aid, while other college representatives exaggerated potential salaries after graduation and failed to provide clear information about program duration, costs or graduation rates despite federal regulations requiring them to do so.

> The GAO said in the report that it plans to refer cases of school officials encouraging fraud and engaging in deceptive practices to the Department of Education's Office of Inspector General, where appropriate.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The report is scheduled to be presented as part of the testimony Wednesday before the Senate Committee on Health, Education, Labor and Pensions, chaired by Sen. Tom Harkin (D., Iowa).

"The results of this broad-reaching survey of for-profit school recruiting practices leave little question that these practices occur across the industry and are in no way limited to a few rogue recruiters or even schools," a spokeswoman for Mr. Harkin said.

113. On August 4, 2010, the Committee held a congressional hearing on recruitment practices of many of the for-profit educational providers. Senator Tom Harkin, the Committee's Chairman, noted in his remarks at the hearing that the GAO report illustrates that the recruitment process at for-profit educational providers is "specifically designed to do whatever it takes to drive up enrollment numbers, more often than not to the disadvantage of students" and is "disturbingly clear that abuses in for-profit recruiting are not limited to a few rogue recruiters or even a few schools with lax oversight. To the contrary, the evidence points to a problem that is systemic to the for-profit industry."

114. As a result of this news, the Company's stock tumbled from $90.32 a share on July 20, 2010 to $64.33 on August 13, 2010 – a 29% drop.

## B.     The Investigation By The Committee

115. On August 6, 2010, the Company issued a press release reporting that the Committee was investigating for-profit colleges receiving Title IV student financial aid and that the Committee had formally requested information and documents from the Company. Specifically:

> On August 6, 2010, ITT Educational Services, Inc. (the "Company") announced that it has received a request for information and documents from the U.S. Senate Committee on Health, Education, Labor and Pensions (the "Committee") relating to the Committee's review of matters related to for-profit colleges receiving Title IV student financial aid. The Company understands that the request is one of 30 similar requests made to for-profit colleges in connection with the Committee's review.

> The request states that it seeks information and documents to more accurately understand how the Company uses Federal resources, including how it recruits and enrolls students, sets program price or tuition, determines financial aid including private or institutional loans, tracks attendance,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

handles withdrawal of students and return of Title IV dollars and manages compliance with the requirement that no more than 90% of revenues come from Title IV dollars. The request also seeks a complete understanding of the number of students who complete or graduate from programs offered by the Company, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how the Company tracks and manages the number of students who risk default within the cohort default rate window.

The Committee requests detailed information about a broad range of the Company's business. The Company intends to cooperate with the Committee and to work with the Committee to provide the requested information in a manner that does not compromise the Company's sensitive proprietary operating and other information. The Committee has requested that the Company provide a portion of the specified information by August 26, 2010 and the remainder of the information by September 16, 2010.

## VI.    INSIDER SELLING ALLEGATIONS

116.    Defendants Cooper, Dean, Elwood, Esbin, Feichtner, Van Buren, and Weber made good use of their inside knowledge about ITT Educational's false and misleading statements about its enrollment growth and the Company's improper and illicit marketing and recruiting tactics.

117.    While the Individual Defendants were issuing false and misleading statements, Defendants Cooper, Dean, Elwood, Esbin, Feichtner, Van Buren, and Weber unloaded 80,638 shares for proceeds of $8,965,734. The following charts identify their illegal insider sales of ITT Educational stock:

| Name | Date | Shares | Ave. Price | Proceeds | % Sold |
|------|------|--------|-----------|----------|--------|
| Feichtner | 06/01/2010 | 3,000 | $100.19 | $300,570 | 100 % |
| | 08/02/2010 | 3,000 | $81.50 | $244,500 | 100% |
| | 10/01/2010 | 3,000 | $71.16 | $213,480 | 100% |
| | | | | | |
| **TOTAL** | | **9,000** | | **$758,550** | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Name | Date | Shares | Ave. Price | Proceeds | % Sold |
|------|------|--------|-----------|----------|--------|
| Cooper | 01/29/2009 | 15,000 | $124.64 | $1,869,675 | 100% |
| **TOTAL** | | **15,000** | | **$1,869,675** | |

| Name | Date | Shares | Ave. Price | Proceeds | % Sold |
|------|------|--------|-----------|----------|--------|
| Weber | 02/13/2009 | 5,000 | $122.8 | $614,400 | 22.17% |
| | 05/10/2010 | 5,000 | $103.74 | $518,730 | 20.68% |
| | 05/12/2010 | 2,500 | $106.29 | $265,740 | 11.53% |
| **TOTAL** | | **12,500** | | **$1,398,870** | |

| Name | Date | Shares | Ave. Price | Proceeds | % Sold |
|------|------|--------|-----------|----------|--------|
| Dean | 07/31/2009 | 10,000 | $98.11 | $981,100 | 29.36% |
| | 05/05/2010 | 3,077 | $104.56 | $321,731 | 10.73% |
| **TOTAL** | | **13,077** | | **$1,392,831** | |

| Name | Date | Shares | Ave. Price | Proceeds | % Sold |
|------|------|--------|-----------|----------|--------|
| Elwood | 01/15/2009 | 22,061 | $110.80 | $2,444,359 | 100% |
| **TOTAL** | | **22,061** | | **$2,444,359** | |

| Name | Date | Shares | Ave. Price | Proceeds | % Sold |
|------|------|--------|-----------|----------|--------|
| Esbin | 02/02/2009 | 5,000 | $126.41 | $632,050 | 100% |
| **TOTAL** | | **5,000** | | **$632,050** | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Name | Date | Shares | Ave. Price | Proceeds | % Sold |
|------|------|--------|-----------|----------|--------|
| Van Buren | 03/24/2010 | 2,400 | $115.16 | $276,384 | 100% |
| | 03/26/2010 | 100 | $115.00 | $11,500 | 100% |
| | 04/22/2010 | 1,500 | $121.01 | $181,515 | 100% |
| | | | | | |
| **TOTAL** | | **4,000** | | **$469,399** | |

## VII.   NO SAFE HARBOR

118.   The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. Forward-looking statements, if any, were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the specific forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ITT Educational who knew that those statements were false when made.

## VIII.   THE STOCK REPURCHASE

119.   In April 2007, ITT Educational's Board authorized the Company to repurchase up to 5,000,000 shares of common stock pursuant to the Repurchase Program.  In January 2010, the Board authorized the Company to repurchase an additional 5,000,000 shares of ITT Educational stock pursuant to the Repurchase Program.   The terms of the Repurchase Program provide that management may repurchase shares of common stock, from time to time depending on market conditions and other considerations.   Unless earlier terminated by the Board, the Repurchase Program expires when management repurchases all shares authorized for repurchase.   The Board

failed to act in the face of a known duty to act when they allowed the Company's senior officers to purchase a total of over *$750 million* of its own stock.

120.    The purchases of the Company's stock, however, were at artificially inflated prices as a result of the false and misleading statements, press releases, and filings with the SEC that misrepresented the Company's enrollment growth.

121.    Additionally, ITT Educational's Board was well aware of the false and misleading statements during the entire repurchase period from January 1, 2008 through September 30, 2010. Nonetheless, the Board did not halt the Company's purchases and continued to allow the Company to purchase shares at artificially inflated prices.  The Board's decision was not the product of a valid business judgment.

122.    The following were the average prices paid for the Company's common stock during the buyback:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| 1/1/08 – 12/31/08 | 1,049,700 | $83.62 | $87,775,914 |
| 1/1/09 – 3/31/09 | 527,833 | $121.93 | $64,358,678 |
| 4/1/09 – 6/30/09 | 622,200 | $96.39 | $59,973,858 |
| 7/1/09 – 9/30/09 | 827,842 | $102.06 | $84,489,554 |
| 10/1/09 – 12/31/09 | 1,500,016 | $92.86 | $139,291,486 |
| 1/1/10 – 3/31/10 | 952,500 | $99.76 | $95,021,400 |
| 4/1/10 – 6/30/10 | 1,000,000 | $105.03 | $105,030,000 |
| 7/1/10 – 9/30/10 | 1,775,000 | $64.73 | $114,895,750 |
| | | | |
| **TOTAL** | **8,255,091** | | **$750,836,640** |

123.    Under the Board's authorization, the Company bought back more than *$750 million* worth of its shares at a weighted average price of $90.95.  Tellingly, this weighted average price is substantially higher than ITT Educational's share price when its true business health was revealed, dropping ITT Educational's stock price to $64.33 on August 13, 2010.  This drop removed the inflation from ITT Educational's stock price, causing real economic loss to the Company which, at the Board's direction, had purchased stock during this time period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

124.    ITT Educational's Board caused ITT Educational to waste more than *$750 million* on stock purchases.  Because the price of ITT Educational's shares was artificially inflated by way of the Individual Defendants' concealment and misrepresentations, the Company, unbeknownst to its shareholders, materially overpaid for its own stock.  The stock purchases falsely signaled to ITT Educational's shareholders and the public that the purchase of the Company's stock at those prices was the best use of ITT Educational's cash.  In reality, however, ITT Educational's stock price was inflated because the Individual Defendants failed to disclose that the Company was engaging in illicit and improper recruiting activities.

125.    Besides constituting corporate waste and a violation of fiduciary duties by the Board, the Company's share purchases also violated the federal securities laws because the Individual Defendants caused ITT Educational to purchase its own shares at prices that were artificially inflated by the Individual Defendants' material misrepresentations and omissions, thereby damaging ITT Educational.

## IX.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

126.    By reason of their positions as officers, directors and/or fiduciaries of ITT Educational and because of their ability to control the business and corporate affairs of ITT Educational, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ITT Educational in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of ITT Educational and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

127.    Each director and officer of the Company owes to ITT Educational and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### B. Audit Committee Duties

128.   In addition to these duties, the Audit Committee Defendants owed specific duties to ITT Educational under the Audit Committee's Charter to assist management in reviewing and approving quarterly and annual financial statements, earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.  In particular, Section 3 of the Audit Committee's Charter provides as follows:

> The Committee will:
>
> (c)   inquire about, consider and review the Accounting Firm, the CCO and management:
>
> > (i)   ITT/ESI's annual and quarterly financial statements, including the Management's Discussion and Analysis of Financial Condition and Results of Operations;
> >
> > (ii)   any ITT/ESI transactions or arrangements that are important for understanding ITT/ESI's financial statements;
> >
> > (iii)   any material financial or non-financial arrangements of ITT/ESI, or off-balance sheet structures, which do not appear on ITT/ESI's financial statements;
> >
> > ***
> >
> > (viii)   earnings press releases, including the use of pro forma or adjusted non-GAAP information;
> >
> > (ix)   financial information and earnings guidance provided to security analysts and rating agencies.

### C. Control, Access, and Authority

129.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of ITT Educational, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ITT Educational.

130.     Because of their advisory, executive, managerial, and directorial positions with ITT Educational, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of ITT Educational, including information regarding the student admissions rate and future growth rate.

131.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ITT Educational, and was at all times acting within the course and scope of such agency.

## D.     Reasonable and Prudent Supervision

132.     To discharge their duties, the officers and directors of ITT Educational were required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company.  By virtue of such duties, the officers and directors of ITT Educational were required to, among other things:

(a)       refrain from acting upon material inside corporate information to benefit themselves;

(b)       ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)       conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)       properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)       remain informed as to how ITT Educational conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(f)      ensure that ITT Educational was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## X.   BREACHES OF DUTIES

133.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ITT Educational, the absence of good faith on their part, and a reckless disregard for their duties to ITT Educational and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to ITT Educational.

134.   The Individual Defendants each breached their duty of loyalty and good faith by allowing the other Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and or failing to disclose: (1) the Company overstated its growth prospects by engaging in illegal and improper recruiting activities, which also artificially inflated the Company's reported results and future growth prospects; (2) the Company's financial results were overstated because the Company's colleges inflated tuition costs and its student loan repayment rates were well below levels required for participation in federal loan programs; (3) the Company failed to maintain adequate systems of internal operational and financial controls; and (4) the Individual Defendants lacked a basis for their positive statements about the Company's prospects and growth. As a result, ITT Educational has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## XI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

135.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

136.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (1) the Company overstated its growth prospects by engaging in illegal and improper recruiting activities,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

which also artificially inflated the Company's reported results and future growth prospects; (2) the Company's financial results were overstated because the Company's colleges inflated tuition costs and its student loan repayment rates were well below levels required for participation in federal loan programs; (3) the Company failed to maintain adequate systems of internal operational and financial controls; and (4) the Individual Defendants lacked a basis for their positive statements about the Company's prospects and growth. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

137.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue false financial results based upon inflated tuition costs and student loan repayment rates that were well below levels required for participation in federal loan programs.

138.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (ii) disguise and misrepresent the Company's future business prospects.

139.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

140.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XII.    DAMAGES TO ITT EDUCATIONAL

141.    The Individual Defendants' wrongful conduct was the direct and proximate cause of the damages ITT Educational suffered. As discussed above, ITT Educational bought back more than *$750 million* worth of its shares at a price that was substantially higher than ITT Educational's share price when its true business health was revealed.

142.    In addition, as a result of the Individual Defendants' wrongful conduct, ITT Educational disseminated false financial statements which failed to disclose that the Company's enrollment growth was a product of improper and illicit marketing and recruiting tactics. The improper statements have devastated ITT Educational's credibility.

143.    In addition, as a result of the Individual Defendants' wrongful conduct, ITT Educational and Defendants Modany and Fitzpatrick have all been sued in at least one class action lawsuit pending in the Southern District of New York. In that class action, the plaintiff alleges that Modany, Fitzpatrick, and the Company violated §10(b) of the 1934 Securities Exchange Act and Rule 10b-5 when Modany and Fitzpatrick disseminated or approved false statements. As a result, the Company will have to incur legal attorneys' fees and costs in connection with investigating and defending that case, and any others, and may ultimately have to pay a tens of millions, if not hundreds of millions, to settle or otherwise satisfy any judgment.

144.    As a direct and proximate result of the Individual Defendants' actions as alleged above, ITT Educational's market capitalization has been substantially damaged.

145.    Further, as a direct and proximate result of the Individual Defendants' conduct, ITT Educational has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred in investigating ITT Educational's improper and illicit marketing and recruiting tactics;

(b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on ITT Educational's artificially-inflated stock price and inflated revenues; and

(c)    costs incurred from the loss of the Company's customers' confidence in ITT Educational's services.

146.    Moreover, these actions have irreparably damaged ITT Educational's corporate image and goodwill.  For at least the foreseeable future, ITT Educational will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ITT Educational's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

147.    Plaintiff brings this action derivatively in the right of and for the benefit of ITT Educational to redress injuries suffered, and to be suffered, by ITT Educational as a direct result of breaches of fiduciary duty, abuse of control, gross mismanagement, unjust enrichment, and insider selling, as well as the aiding and abetting thereof, by the Individual Defendants.  ITT Educational is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

148.    Plaintiff will adequately and fairly represent the interests of ITT Educational in enforcing and prosecuting its rights.

149.    Plaintiff was a shareholder of ITT Educational at the time of the wrongdoing of which Plaintiff complains and has continuously held stock in the Company at all relevant times.

150.    The Board of ITT Educational currently consists of the following nine individuals: Modany, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena.

### A.    Demand Is Futile As To Defendant Modany

151.    Defendant Modany faces a substantial likelihood of liability for his individual misconduct.  Modany is a named defendant in at least one federal class action pending in the Southern District of New York alleging that he and the Company Defendants violated §10(b) of the 1934 Securities Exchange Act and Rule 10b-5 when he disseminated or approved false statements.

152.    If Modany pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities law.  This, in turn, would impair

the defense of the class action and greatly increase the probability of Modany's personal liability in the class action. As such, Modany is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Thus, demand is futile as to Modany.

153.    Additionally, Modany cannot render an independent decision because he is and was a high-ranking officer of ITT Educational during the time period when the wrongdoing occurred. Modany is Chairman of the Board and Chief Executive Officer of the Company. According to relevant portions of the Company's 2010 proxy statement, Modany is not independent under applicable NYSE rules. Thus, Modany is a current Company insider and therefore cannot independently consider a demand.

154.    Additionally, Modany is interested because he issued many of the false and misleading statements. Modany therefore faces a substantial likelihood of liability for breaching his fiduciary duties to ITT Educational shareholders. Consequently, Modany cannot disinterestedly consider a demand.

## B.    Demand Is Futile As To The Audit Committee Defendants

155.    Defendants Cozzi, Dean, Lau, and Waterhouse were responsible under the Audit Committee charter for reviewing and approving quarterly and annual financial statements, earnings press releases, and ITT Educational's internal controls over financial reporting. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved false financial statements that did not properly (i) account for the Company's growth and growth prospects; and (ii) disclose that the Company was engaging in improper and illicit marketing and recruiting tactics to artificially boost its growth. The Audit Committee Defendants also reviewed and approved ITT Educational's financial reporting internal controls, which were ineffective.

156.    As a result of (a) their access to and review of internal corporate documents; (b) conversations and connections with other corporate officers, employees and directors; and (c) attendance at management and Board meetings, each of the Audit Committee Defendants knew the adverse non-public information regarding ITT Educational's business, operations, and management.

Indeed, each of the Audit Committee Defendants knew of the wrongdoing complained herein. Thus, each Audit Committee Defendant faces a sufficiently substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.

157. Defendants Cozzi, Dean, Lau, and Waterhouse authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them. Thus, they face a sufficiently substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

**C.     Demand Is Futile As To Defendants Dean And Weber**

158. Defendants Dean and Weber engaged in insider trading in violation of Indiana and Delaware law. Dean sold 13,077 shares of ITT Educational stock for proceeds of $1,392,831 while in possession of material non-public information. Similarly, Weber sold 12,500 shares of ITT Educational stock for proceeds of $1,398,870 while in possession of material non-public information. Due to their high-level positions as Board members, Dean and Weber knew that the Company was engaging in illicit and improper recruiting methods. Dean and Weber took advantage of this undisclosed information to sell their stock for considerably more than the stock was worth. Because Dean and Weber face a substantial likelihood of liability for engaging in insider trading, they are unable to render a disinterested decision on whether to pursue these derivative claims. As such, demand is futile as to Defendants Dean and Weber.

**D.     Demand Is Futile As To All Of The Director Defendants For Authorizing And Continuing To Allow The Share Repurchases**

159. The Director Defendants authorized the Company to purchase up to 10 million shares of its common stock on the open market. The Company's senior officers caused ITT Educational to purchase over 8 million shares of its own stock for more than $750 million between January 1, 2008 and September 30, 2010. The purchases of the Company's stock, however, were at artificially

inflated prices as a result of the false and misleading public statements, press releases, and filings with the SEC. Each of these Director Defendants knew, failed to act in the face of a known duty to act, and/or with gross negligence should have known that the Individual Defendants' statements were false and misleading, and that, as a result, the Company's stock was artificially inflated. Indeed, the weighted average price for the share repurchases was $90.95. This weighted average price is substantially higher than ITT Educational's share price of $64.33 when the Company's true business health was revealed on August 13, 2010. While the Director Defendants improperly authorized the Company's repurchase program, they also failed to halt ITT Educational's share purchases. Thus, the Director Defendants are each subject to a substantial likelihood of liability for breaching their fiduciary duties and for committing corporate waste. Thus, demand is futile as to the Director Defendants.

### E.    Demand Is Futile As To All Of The Director Defendants For Additional Reasons

160.    ITT Educational specializes in providing for-profit education and relies substantially on the federal government to loan money to its students to pay for their education. ITT Educational's enrollment and enrollment growth prospects were a forceful indicator of the Company's business condition and the key metric that the Company used to measure its current and future financial performance. Indeed, when the information at issue pertains to a company's core business or service, as it does here, knowledge of that information may be imputed to the entire board through inference as a matter of law. Thus, each of the members of the ITT Educational Board are charged with having knowledge of the issues described herein related to the Company's false and misleading statements about its overstated enrollment growth, inflated enrollment growth prospects, and improper recruiting activities.

161.    The Director Defendants, as members of the ITT Educational Board, each knew, failed to act in the face of a known duty to act, and/or were grossly negligent when they allowed the Company to issue public statements, press releases, and filings with the SEC regarding the Company's growth prospects and financial results. Moreover, the Director Defendants each knew, failed to act in the face of a known duty to act, and/or with gross negligence allowed this materially

false and misleading information to be disseminated to the investing public. The Director Defendants knowingly, with conscious disregard, and/or gross negligence participated in the dissemination of this deceptive information. Thus, demand is futile as to the Director Defendants.

162.     The Director Defendants, as members of the ITT Educational Board, each had a duty to ensure that reliable systems of financial controls and reporting were in place at the Company and functioning properly. ITT Educational, however, did not accurately report its future growth prospects, tuition costs, or student loan repayment rates. The Director Defendants each knew, failed to act in the face of a known duty to act, and/or with gross negligence ignored the fact that the Company lacked adequate internal controls. Despite this, the Director Defendants took no steps to avert or correct the situation. The Company's lack of adequate internal controls allowed the materially false and misleading information regarding the Company's financial reporting to be disseminated to the investing public. Thus, the Director Defendants are each subject to a substantial likelihood of liability, and therefore, demand is futile as to the Director Defendants.

163.     If ITT Educational's officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duties alleged in this Complaint by D&O Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by ITT Educational against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of ITT Educational, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file a derivative lawsuit because such a claim might not be covered under the Company's D&O insurance policy.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

164.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting ITT Educational by prosecuting this action.  Therefore, demand on ITT Educational and its Board is futile and is excused.

165.     ITT Educational has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Against Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena for Violation of §10(b) of the Securities Exchange Act

166.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.     The wrongful conduct alleged regarding the issuance of false and misleading statements, from about January 2008 through August 2010, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

168.     As alleged above, from January 2008 to August 2010, Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena knowingly, or with deliberate recklessness, made and caused the publication of false and misleading statements regarding the Company's enrollment growth.  Defendants Modany and Fitzpatrick issued press releases about the Company's enrollment growth, and signed false and misleading quarterly and annual financial statements.  Defendants Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena signed and approved false and misleading annual statements.

169.     ITT Educational purchased 8,255,091 shares of its own stock on the open market, for a total cost to ITT Educational of $750,836,640, when Defendants Modany, Fitzpatrick, Cozzi,

Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena knew that ITT Educational's stock price was artificially inflated due to their misleading statements.

170. The false statements and repurchases of ITT Educational's stock were intended to and did manipulate and/or deceive ITT Educational and its shareholders and served to further artificially inflate the Company's stock price.

171. Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena thereby violated §10(b) of the Securities Exchange Act and SEC Rule 10b-5 in that they:

> (i) employed devices, schemes, and artifices to defraud ITT Educational;
>
> (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and
>
> (iii) engaged in acts, practices, and a course of business that operated as fraud or deceit upon ITT Educational in connection with the purchases of ITT Educational common stock.

172. As a direct and proximate result of the wrongful conduct of Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena, ITT Educational has and will suffer damages in connection with its purchases of ITT Educational common stock at prices that Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena knew to be artificially inflated.

173. But for the misconduct of Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena, ITT Educational would not have purchased its stock at artificially inflated prices. ITT Educational reasonably relied on the diligence, loyalty, and good faith of Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena in purchasing its stock.

174. Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena are therefore liable to ITT Educational for damages in an amount to be determined

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

at trial pursuant to §10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

**Against the Director Defendants for Violation of §20(a) of the Securities Exchange Act**

175. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

176. The wrongful conduct alleged regarding the issuance of false and misleading statements, from about January 2008 through August 2010, was continuous, connected, and on-going and caused significant harm to the Company.

177. The Director Defendants had the power, and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, and had the power and/or ability to directly or indirectly control or influence Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena, in connection with the specific conduct that violated §10(b) of the Securities Exchange Act and SEC Rule 10b-5 as alleged above.

178. The Director Defendants did not act in good faith in regard to these allegations. They are jointly and severally liable under §20(a) of the Securities Exchange Act to the same extent as Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena for the primary violations of §10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.

## COUNT III

**Against Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena for Breach of Fiduciary Duties Related To The Dissemination of False and Misleading Statements**

179. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180. Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena owed and owe ITT Educational fiduciary obligations. By reason of their fiduciary relationships, Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Weber, and Yena owed and owe ITT Educational the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

181.   Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

182.   Defendants Modany, Fitzpatrick, Cozzi, Dean, Fowler, Lau, Odle, Waterhouse, Weber, and Yena each knowingly, recklessly or negligently signed or approved the issuance of false annual and quarterly financial statements that misrepresented and failed to disclose material information concerning the Company's enrollment growth, enrollment growth prospects, and improper recruiting methods.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

183.   As a direct and proximate result of these Individual Defendants' failure to perform their fiduciary obligations, ITT Educational has sustained significant damages.  As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

184.   Plaintiff, on behalf of ITT Educational, has no adequate remedy at law.

### COUNT IV

**Against the Audit Committee Defendants Cozzi, Dean, Lau, and Waterhouse for Breach of Fiduciary Duties**

185.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.   The Audit Committee Defendants – Cozzi, Dean, Lau, and Waterhouse – owed and owe ITT Educational fiduciary obligations.  Additionally, as members of the Audit Committee, these Individual Defendants owed and owe specific duties under the Audit Committee charters to review and discuss the Company's quarterly and annual financial results and earnings releases, and to review the effectiveness and adequacy of the Company's internal control structure.  By reason of their fiduciary relationships, these Individual Defendants owed and owe ITT Educational the highest obligation of loyalty and good faith.

187. The Audit Committee Defendants each violated and breached their fiduciary duties of loyalty and good faith, reasonable inquiry, and oversight and supervision by knowingly or recklessly: (i) reviewing and approving false financial statements; and (ii) reviewing and approving ineffective internal controls over financial reporting.

188. The Audit Committee Defendants' actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interest.

189. As a direct and proximate result of the Audit Committee Defendants' failure to perform their fiduciary obligations, ITT Educational has sustained significant damages. As a result of the misconduct alleged herein, the Audit Committee Defendants are liable to the Company.

## COUNT V

### Against Defendants Dean, Weber, Cooper, Elwood, Esbin, Feichtner, and Van Buren for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

190. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191. At the time Defendants Dean, Weber, Cooper, Elwood, Esbin, Feichtner, and Van Buren sold their ITT Educational stock, they knew the information described above, and sold ITT Educational stock on the basis of such information.

192. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendants Dean, Weber, Cooper, Elwood, Esbin, Feichtner, and Van Buren used for their own benefit when they sold ITT Educational stock.

193. At the time of their stock sales, Defendants Dean, Weber, Cooper, Elwood, Esbin, Feichtner, and Van Buren knew that the Company's revenues were materially overstated. These Individual Defendants' sales of ITT Educational stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

194.   Since the use of the Company's proprietary information for their own gain constitutes a breach of these Individual Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

195.   Plaintiff, on behalf of ITT Educational, has no adequate remedy at law.

## COUNT VI

### Against Defendants Modany, Fitzpatrick, Feichtner, and Elwood for Unjust Enrichment

196.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

197.   By their wrongful acts and omissions, Defendants Modany, Fitzpatrick, Feichtner, and Elwood were unjustly enriched at the expense of and to the detriment of ITT Educational.

198.   Defendants Modany, Fitzpatrick, Feichtner, and Elwood were unjustly enriched because they received compensation from the Company that was tied to the Company's performance during times when such Individual Defendants knew or should have known that the Company's financial results and performance were artificially inflated due to these Individual Defendants' wrongdoing.

199.   Plaintiff, as a shareholder and representative of ITT Educational, seeks restitution from these Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants from their wrongful conduct and fiduciary breaches.

200.   Plaintiff, on behalf of ITT Educational, has no adequate remedy at law.

## COUNT VII

### Against the Director Defendants for Breach of Fiduciary Duties for Authorizing and Failing to Halt the Company's Stock Repurchases

201.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.   The wrongful conduct alleged regarding the issuance of false and misleading statements, from about January 2008 to August 2010, was continuous, connected, and on-going

throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

203.    The Director Defendants owed and owe ITT Educational fiduciary obligations.  By reason of their fiduciary relationships, these Individual Defendants owed and owe ITT Educational the highest obligation of loyalty, fair dealing, and good faith.

204.    The Director Defendants violated and breached their fiduciary duties by knowingly, or with conscious disregard of their duties, authorizing the ITT Educational stock repurchase plan and failing to halt the Company's purchases under the stock repurchase plan while ITT Educational's share price was artificially inflated as a result of the false and misleading statements. ITT Educational repurchased 8,255,091 shares of its own stock on the open market, for a total cost to ITT Educational of $750,836,640.

205.    The Director Defendants' wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

206.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, ITT Educational has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VIII

### Against All Defendants for Waste of Corporate Assets

207.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

208.    The wrongful conduct alleged regarding the issuance of false and misleading statements, from about January 2008 through August 2010, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

209.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) directing ITT Educational to purchase over $750 million of its own stock at artificially inflated prices; (ii) paying bonus and non-equity incentive compensation to certain

executive officers; and (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

210.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

211.    Plaintiff, on behalf of ITT Educational, has no adequate remedy at law.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct, including without limitation violations of §§10(b) & 20(a) of the 1934 Securities Exchange Act, breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

B.    Directing ITT Educational to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ITT Educational and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of recruitment operations and policies;

- a proposal to strengthen internal controls and policies concerning student eligibility for federal financial aid and for monitoring and reporting Cohort Default Rates;

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of ITT Educational to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of ITT Educational's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- a provision to appropriately test and then strengthen the internal audit and control functions;

C. Awarding to ITT Educational restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## XV. JURY DEMAND

Plaintiff demands a trial by jury.


DATED: November 22, 2010

IRWIN B. LEVIN
DAVID J. CUTSHAW
RICHARD E. SHEVITZ
ERIC S. PAVLACK
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON
FRANCIS A. BOTTINI JR.
KEITH M. COCHRAN
501 West Broadway, Suite 1720
San Diego, California 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622

*Attorneys for Plaintiff Roger B. Orensteen*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Roger B. Orensteen, hereby verify that I am a shareholder of ITT Educational Services, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Verified Shareholder Derivative Complaint, having reviewed it with counsel, I hereby authorize its filing.

Date: 11/18/2010

Roger B. Orensteen